UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

IUOE LOCAL 324 RETIREMENT TRUST
FUND, ET AL.,

               Plaintiffs,               Civil Case No. 17-13921
                                              Honorable Linda V. Parker

v.

LGC GLOBAL FM, LLC (f/k/a Lakeshore
Rickman JV, LLC) and AVINASH RACHMALE,

               Defendants.
_____/

## OPINION AND ORDER GRANTING IN PART AND DENYING IN PART PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT

This is an action to recover fringe benefit contributions allegedly owed to

Plaintiffs, which are pension and welfare benefit trust funds established and

administered pursuant to Section 302 of the Labor Management Relations Act of

1947, as amended, 29 U.S.C. § 186 ("LMRA"), and the Employee Retirement

Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 et seq.  The funds

provide health care, pension, retirement, and apprenticeship training benefits for

members of Operating Engineers Local 324, a labor union.  Pursuant to an audit of

Defendant LGC Global FM, LLC ("LGC"), Plaintiffs claim that LGC owes

$272,467.73 for unpaid contributions to the funds for the periods October 2015-

January 2016 and April 2018-June 2018.  Plaintiffs seek to hold Defendant

Avinash Rachmale ("Mr. Rachmale") personally liable for the unpaid contributions as an ERISA fiduciary.

Presently before the Court is Plaintiffs' motion for partial summary judgment in which Plaintiffs ask the Court to enter judgment in their favor against LGC and Mr. Rachmale and award Plaintiffs the above amount, in addition to fees and costs, liquidated damages, and interest. (ECF No. 36.) Plaintiffs also ask the Court to order LGC to submit to an audit to determine amounts due and owing for all unaudited periods beginning June 2016. The motion has been fully briefed (ECF Nos. 41, 42) and the Court held a motion hearing on September 11, 2019. At the Court's request, the parties filed supplemental material following the hearing.[1] (ECF Nos. 47, 48.)

## Factual and Procedural Background

LGC, initially named Lakeshore Rickman JV, LLC, was awarded a contract in 2014 to perform operations management at a number of Detroit Public Schools. (Defs.' Resp. Ex. 1 ¶¶ 2, 3, ECF No. 41-1 at Pg ID 412.) At first, the company

---

[1] Plaintiffs also filed a motion to strike Defendants' supplemental submission, arguing that it exceeds the scope of what the Court requested. (ECF No. 49.) If the Court is not inclined to strike Defendants' submission, Plaintiffs asks the Court to grant them the opportunity to file a response brief. The Court does not agree that Defendants' submission is improper and therefore declines to strike it. The Court's decision on the pending summary judgment motion is not impacted by the objected to arguments and matters in the submission and thus the Court also finds it unnecessary for Plaintiffs to file an additional brief to address them. The Court therefore is denying Plaintiffs' motion to strike.

performed the work using its own employees. (*Id*. ¶ 5, Pg ID 413.) It therefore

entered a collective bargaining agreement ("CBA") with the International Union of

Operating Engineers Local 324 (hereafter "Local 324" or "Union"), which covered

the work performed by Stationary Engineers and Boiler Operators in DPS

buildings.[2] (Pls.' Mot. Ex. A, ECF No. 36-2.) Roderick Rickman, Lakeshore-

Rickman's Chief Executive Officer, signed the CBA on October 1, 2014.

The CBA was effective from August 13, 2014 through August 12, 2017.

(*Id*.) However, the CBA contained the following renewal provision:

> This Agreement shall remain in full force and effect through
> August 12, 2017, and thereafter shall be renewed from year to year
> unless either party shall notify the other party in writing at least sixty
> (60) days prior to any anniversary date of this Agreement. Such
> written notice shall be sent by registered or certified mail to the other
> party.

(*Id*. at Art. XXXVIII, Pg ID 313.)

Under the CBA, signatory employers were required to make contributions to

Local 324 funds according to contribution rates set forth in the agreement. (*Id*.)

The rates were based on the hours worked by covered employees. (*Id*.) Pursuant

to the CBA, the Trust Agreements establishing the plans, together with any

insurance or related agreements approved by a majority of the Plan Trustees, were

incorporated into the CBA. (*Id*.) The Trust Agreement for the health care plan

---

[2] Although the CBA was executed by Lakeshore Rickman, it was binding on its
successor, LGC. (*See* Pls.' Mot. Ex. A Art. XVI, ECF No. 36-2 at Pg ID 305.)

provides *inter alia* that contributions employers are required to make to the health care fund pursuant to the CBA "become vested Plan assets at the time they become due and owing to the Fund."  (Pls.' Mot. Ex. G at 2, ECF No. 36-8 at Pg ID 355.) The Trust Agreement also grants the Trustee authority "to impose a reasonable cost of collection assessment upon a delinquent Employer, in the nature of liquidated damages and not as a penalty, as decided by the Trustees, for delinquent Contributions as well as attorney, accounting, audit and related costs and fees." (*Id*. at 9, Pg ID 362.)  Trust documents set forth the liquidated damages to be paid on unpaid contributions, which is at least 10% of the total amount due.  (Pls.' Supp. Exs. A ¶¶ 3(b)-(d), Ex. B § 4.5, ECF Nos. 47-2, 47-3.)

In December 2015, LGC contracted with Tiskono & Associates, LLC ("Tiskono") to perform LGC's responsibilities under the DPS contract.  (Defs.' Resp. Ex. 1 ¶ 7, ECF No. 41-1 at Pg ID 413.)  It appears that Tiskono assumed LGC's responsibilities under the CBA; however, LGC has not contested its continued liability as signatory to the CBA if Tiskono failed to fulfill its obligations.  (*See id.* ¶ 8.)  Tiskono in fact failed to meet its financial obligations under the CBA and Local 324 filed a complaint with the National Labor Relations Board against LGC, Tiskono, and another entity ("NLRB Complaint").  (*Id.*; *see also* Defs.' Resp. Ex. 3, ECF No. 41-3.)

The complaints filed in the NLRB action alleged that LGC failed to meet its financial and other obligations under the CBA *since February 2016*. (Defs.' Resp. Ex. 3 ¶ 18, ECF No. 41-3 at Pg ID 488; Defs.' Supp. Ex. 1 ¶ 18, ECF No. 48-2 at Pg ID 827.) This included LGC's obligation to make contributions to the following Local 324 funds: health and welfare plan; retirement savings plan; and education and apprenticeship fund. (*Id.*) The NLRB matter eventually was resolved through a settlement agreement, which LGC President Shashidar Shastri ("Mr. Shastri") signed on March 21, 2017. (Defs.' Resp. Ex. 4, ECF No. 41-4 at Pg ID 502.)

In the settlement agreement, the charged parties agreed to *inter alia* "make retirement, annuity, and training fringe benefit contributions in the amount of $324,600 to satisfy the parties' collective-bargaining agreement, and comply with the contractual provisions requiring continued fringe benefit fund contributions." (*Id.* at 2, ECF No. 41-4 at Pg ID 500.) The agreement contained a "Scope of the Agreement" provision, which reads in pertinent part:

> This Agreement settles only the allegations in the above-captioned cases, and does not settle any other cases or matters. It does not prevent persons from filing charges, the General Counsel from prosecuting complaints, or the Board and the courts from finding violations with respect to matters that happened before this Agreement was approved regardless of whether General Counsel knew of those matters or could have easily found them out.

(*Id.* at 3, Pg ID 501.)

According to Mr. Shastri, now LGC's Executive Vice President, LGC

entered into an agreement with Ringo Services, Inc. ("Ringo"), pursuant to which

Ringo performed the DPS work from January 7, 2017 through March 30, 2018.

(Defs.' Resp. Ex. 1 ¶ 14, ECF No. 41-1 at Pg ID 414; *see also id*. Ex. 5.)  Mr.

Shastri states that in June 2017, he authorized Dan Ringo, Ringo's President, to

exercise LGC's right not to renew the CBA.  (Defs.' Resp. Ex. 1 ¶ 17, ECF No. 41-

1 at Pg ID 415.)  In an email to Mr. Ringo dated July 3, 2017, Mr. Shastri wrote:

> I recall you sent a mail/letter to Jim Arini notifying intent [sic] not to
> renew CBA after expiry on August 12th, 2017 ……… please confirm
> you sent the notice by certified/registered mail as required by article
> XXXVII of CBA.  The clause required 60 day notice.

(*Id.* Ex. 6, ECF No. 41-6 at Pg ID 521.)  Mr. Ringo responded on the same date: "It

was sent."  (*Id.*)

In fact, Mr. Ringo sent a letter to Jim Arini, Local 324's Business

Representative, which stated:

> Ringo Services will exercise its rights under Article XXXVII of the
> Collective Bargaining Agreement and hence said rights will be
> executed according to Article XXXVII of the current labor agreement.

(Pls.' Reply Ex. 1, ECF No. 42-2.)  The letter is dated June 26, 2017.  (*Id.*)

From April through June 2018, LGC employed its own personnel to work on

the DPS contract.  (*Id.* ¶ 15, Pg ID 415.)  LGC did not make contributions to

Plaintiffs' funds pursuant to the CBA during this period or thereafter because,

according to Mr. Shastri, the CBA had long since expired.  (*Id*. Ex. 1 ¶ 15, ECF

6

No. 41-1 at Pg ID 415.)  Mr. Shastri provides that LGC treated all of its employees as non-union employees during this period and offered them benefits options available to non-union employees.  (*Id*. ¶ 18, Pg ID 416.)  He further provides that Local 324 continuously pressured LGC to sign a new CBA during this period.  (*Id*. ¶ 19, Pg ID 416.)

According to his declaration, Mr. Rachmale is an officer of LGC.  (Defs.' Resp. Ex. 7, ECF No. 41-7 at Pg ID 523.)  However, when asked to list each and every officer and/or director of LGC, and the office that each holds or has held for the past three years, Defendants answered: "As a limited liability company, [LGC] does not have officers or directors."  (Pls.' Mot. Ex. D at 7, ECF No. 36-5 at Pg ID 336.)  In response to Plaintiffs' Interrogatory No. 4, asking Defendants to state Mr. Rachmale's duties and responsibilities with LGC, Defendants responded: "Avinash Rachmale's responsibility is to sign checks on behalf of the entity.  He is not involved in the management of the entity."  (*Id.* at 5, Pg ID 334.)  Plaintiffs' Interrogatory No. 5 asked:

> Please state the name, job title and job duties of each individual that makes determinations of what company bills and/or invoices to pay, including but not limited to the purchase of materials and/or supplies, and/or the payment of employee benefit contributions to Plaintiff Funds.

(*Id*.)  Defendants answered: Jinansh Shah, Account Executive, and Neetu Khullar, Senior Accountant.  (*Id*. at 6, Pg ID 335.)

On December 5, 2017, Plaintiffs filed this lawsuit against LGC and Mr. Rachmale.  Plaintiffs assert the following claims in an Amended Complaint filed January 11, 2019: (I) against LGC for breach of the CBA and violations of ERISA; (II) against Mr. Rachmale for breach of his fiduciary duties in violation of ERISA; (III) against LGC to hold it liable for contributions due for Tiskono's employees under the theory that Tiskono is an alter-ego/single employer of LGC.  (Compl., ECF No. 34.)  Pursuant to a Scheduling Order entered initially in this matter on April 26, 2108,[3] and amended on July 12, 2018 and again on August 13, 2018, the deadline for discovery was December 12, 2018.  Plaintiffs filed the pending motion for partial summary judgment on February 11, 2019.

During the pendency of this action, Plaintiffs' auditor completed audits based on records provided by LGC.  According to letters from the auditor to LGC, dated February 11, 2019, the following contributions are owed for the periods October 2015 to January 2016 and April through June 2018: (a) Annuity Fund: $22,330.21; (b) Training Fund: $7,443.41; (c) Pension Fund: $66,990.61; and (d) Health Care Fund: $175,703.50.  (Pls.' Mot. Ex. B, ECF No. 36-3.)  In addition to

---

[3] There is a significant delay between the initiation of this lawsuit and the initial scheduling order because defendants did not timely respond to Plaintiffs' complaint and thus Plaintiffs moved for Clerk's entries of default and then default judgment.  Only after the Court scheduled a hearing on Plaintiffs' motion for default judgment did Defendants' counsel enter his appearance.  The parties thereafter stipulated to an order withdrawing the motion for default judgment and setting aside the Clerk's entries of default.  (*See* ECF No. 16.)

the $272,467.73 in unpaid contributions, the audit results list the liquidated

damages due (i.e., 10% of the outstanding contributions) and the cost of the audits.

(*Id.*)

## Applicable Standard of Review

Plaintiffs seek partial summary judgment under Rule 56 of the Federal Rules

of Civil Procedure. Summary judgment pursuant to Rule 56 is appropriate "if the

movant shows that there is no genuine dispute as to any material fact and the

movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The

central inquiry is "whether the evidence presents a sufficient disagreement to

require submission to a jury or whether it is so one-sided that one party must

prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52

(1986). After adequate time for discovery and upon motion, Rule 56 mandates

summary judgment against a party who fails to establish the existence of an

element essential to that party's case and on which that party bears the burden of

proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

The movant has the initial burden of showing "the absence of a genuine

issue of material fact." *Id*. at 323. Once the movant meets this burden, the

"nonmoving party must come forward with specific facts showing that there is a

genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475

U.S. 574, 587 (1986) (internal quotation marks and citation omitted). To

demonstrate a genuine issue, the nonmoving party must present sufficient evidence upon which a jury could reasonably find for that party; a "scintilla of evidence" is insufficient. *See Liberty Lobby*, 477 U.S. at 252. The court must accept as true the non-movant's evidence and draw "all justifiable inferences" in the non-movant's favor. *See Liberty Lobby*, 477 U.S. at 255.

"A party asserting that a fact cannot be or is genuinely disputed" must designate specifically the materials in the record supporting the assertion, "including depositions, documents, electronically stored information, affidavits or declarations, stipulations, admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c)(1). Notably, the trial court is not required to construct a party's argument from the record or search out facts from the record supporting those arguments. *See, e.g., Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479-80 (6th Cir. 1989) ("the trial court no longer has a duty to search the entire record to establish that it is bereft of a genuine issue of material fact") (citing *Frito-Lay, Inc. v. Willoughby*, 863 F.2d 1029, 1034 (D.C. Cir. 1988)); *see also InterRoyal Corp. v. Sponseller*, 889 F.2d 108, 111 (6th Cir. 1989), *cert. denied* 494 U.S. 1091 (1990) ("A district court is not required to speculate on which portion of the record the nonmoving party relies, nor is it obligated to wade through and search the entire record for some specific facts that might support the nonmoving party's claim."). The parties are required to designate with specificity the portions of the record

such that the court can "readily identify the facts upon which the . . . party relies[.]" *InterRoyal Corp.*, 889 F.2d at 111.

## Applicable Law and Analysis

### LGC's Liability for Unpaid Contributions

Pursuant to ERISA, an employer is obligated to make contributions to multiemployer plans according to the terms and conditions of the CBA to which the employer is a signatory. 29 U.S.C. § 1145. This includes the terms and conditions of the plans incorporated within the CBA. *See Bakery & Confectionary Union and Indus. Int'l Health Benefits & Pension Funds v. New Bakery Co.*, 133 F.3d 955, 959 (6th Cir. 1998). Trustees of the funds to which the employer is obligated to make contributions are authorized to enforce this requirement as fiduciaries. *See* 29 U.S.C. § 1132(a)(3).

ERISA requires employers to "… maintain records with respect to each of his employees sufficient to determine the benefits due or which may become due to such employees." 29 U.S.C. § 1059(a). If the employer fails to maintain adequate records to determine the amount of work for which contributions are due under a CBA, it is the employer's burden to prove that work performed by its employees was covered or not covered. *Mich. Laborers' Health Care Fund v. Grimaldi Concrete*, 30 F.3d 692, 695-96 (6th Cir. 1994) (citations omitted). In *Grimaldi Concrete*, the funds' auditor could not determine the amount of work for which

11

contributions were due under the CBAs because the employer's records failed to specify the hours employees spent performing covered work. *Id*. at 694-95. The Sixth Circuit affirmed the district court's holding that "'the penalty must fall upon the person who had the legal responsibility to maintain those records'" and therefore the employer was liable "for all contributions on all hours worked during a period in which it has been demonstrated that some covered work was performed." *Id*. at 695, 697.

In a civil action to recover unpaid contributions, ERISA grants courts the authority to award a plan:

(A) the unpaid contributions,

(B) interest on the unpaid contributions,

(C) an amount equal to the greater of—

    (i) interest on the unpaid contributions, or

    (ii) liquidated damages provided for under the plan in an amount not in excess of 20 percent (or such higher percentage as may be permitted under Federal or State law) of the amount determined by the court under subparagraph (A),

(D) reasonable attorney's fees and costs of the action, to be paid by the defendant, and

(E) such other legal or equitable relief as the court deems appropriate.

29 U.S.C. § 1132(g)(2). The Sixth Circuit has held that § 1132(g)(2)'s language is mandatory upon judgment in favor of a plan. *Mich. Carpenters Council Health & Welfare Fund v. C.J. Rogers, Inc.*, 933 F.2d 376, 388 (6th Cir. 1991).

Defendants contend that LGC is not liable for additional contributions for the October 2015-January 2016 period, even though the audit results reflect a balance of $23,413.30 for that period. According to Mr. Shastri, "LGC's records show that [it] did pay fringe benefits from October 2015-Jaunary 2016[.]" (Defs.' Resp. Ex. 1 ¶ 13, ECF No. 41-1 at Pg ID 414.) Mr. Shastri further declares that the funds did not claim contributions were owing for that period prior to filing this lawsuit. Defendants maintain that the March 2017 settlement in the NLRB action satisfied any contributions due from LGC prior to the date of the settlement.

As set forth in the preceding section, the charged parties (including LGC) agreed in the NLRB settlement "to make retirement, annuity, and training fringe benefit fund contributions in the amount of $324,600 to satisfy the parties' collective-bargaining agreement, and comply with the contractual provisions requiring continued fringe benefit fund contributions." (Defs.' Resp. Ex 4 at 2, ECF No. 41-4 at Pg ID 500.) It is not clear from the agreement what period these payments covered; however, the complaint filed with the NLRB alleged only that the charged parties failed to make contributions "[s]ince about February 2016[.]" (Id. Ex. 3 ¶ 18, ECF No. 41-3 at Pg ID 488.) Moreover, the "Scope of the

Agreement" provision expressly states that it "settles only the allegations in the above-captioned cases, and does not settle any other cases or matters." (*Id*. Ex. 3 at 2, ECR No. 41-4 at Pg ID 500.) The provision further states that the agreement "does not prevent persons from filing charges" or "the courts from finding violations with respect to matters that happened *before this Agreement was approved* ...." (*Id*., emphasis added.)

As such, the plain terms of the agreement do not reflect the parties' intent to foreclose other actions to recover fringe benefit contributions owed for a period prior to March 2017. Plaintiffs were not parties to the NLRB action. They argue in their reply brief that "[t]he Funds are not precluded from pursuing the unpaid contributions because the Union had previously sought some contributions under the CBA as the 'funds often are not in a position to know what is going on between the employer and the union, and the union may have interests that differ from or are inimical to the funds' interests.'" (Pls.' Reply Br. at 2, ECF No. 42 at Pg ID 596, quoting *Laborers' Pension Trust Fund-Detroit & Vicinity v. Rocwall Co.*, 357 F. App'x 638, 640 (6th Cir. 2009).)[4] It is well-established under Sixth Circuit

---

[4] The issue in *Rocwall* was whether the employer could assert the CBA's 90-day time limit for the union to make claims of delinquent contributions as a defense in a fringe benefit collection action filed by the trustees of various fringe benefit plans to which the employer was obligated to make contributions under the CBA. 357 F. App'x at 638. The Sixth Circuit held that the employer could not raise a contract defense pertaining to the union's conduct against the ERISA funds. *Id*. at 640-41.

precedent that multiemployer plans like Plaintiffs are entitled to "rely upon the terms of collective bargaining agreements and plans as written" irrespective of "the actual intent of and understandings between the contracting parties" or any defenses the contracting employer may have against the union. *New Bakery Co. of Ohio*, 133 F.3d at 959; *see also Orrand v. Scassa Asphalt, Inc.*, 794 F.3d 556, 563 (6th Cir. 2015) (restating this well-established rule and explaining that the only "narrow exception" is for conduct that could support a claim for fraud in the execution of the contract).

Defendants assert that "the Union undeniably was looking for instances of unpaid fringe benefits arising from this Project[]" during the NLRB action and that "it found none[.]" (*Id.* at 9, ECF no. 41 at Pg ID 393.) Defendants argue that this is "strong circumstantial evidence that fringe benefits were paid for that time." (*Id.*) Defendants, however, present no evidence to show that the Union was in fact looking for unpaid contributions for any period not alleged in the NLRB complaint (in other words, for periods prior to February 2016) *or* that it found no contributions owed for any other period. Defendants' assertions are purely speculative. Moreover, Defendants do not explain how the Union's actions and/or findings bind Plaintiffs here.

Defendants have not presented evidence suggesting that the NLRB settlement agreement included or was intended to include the unpaid contributions

Plaintiffs now seek for the October 2015-January 2016 period. Mr. Shastri states that LGC's records reflect that it "did pay fringe benefits [for that period.]" This, however, is not evidence that LGC made *all* fringe benefit contributions owed between those dates. And while Mr. Shastri also states that Plaintiffs never previously claimed that contributions were owing for the above period, Defendants do not argue that Plaintiffs are barred from now seeking those contributions because they did not previously assert a claim for the money. Defendants do not argue that the claim is time-barred or foreclosed under the claim preclusion doctrine.

For these reasons, Defendants fail to present evidence to create a material issue of fact with respect to LGC's obligation to pay contributions owing for the period from October 2015-January 2016.[5] Defendants nevertheless argue that if LGC is liable for unpaid contributions for this period, it is not liable in the amounts set forth in the audit results submitted by Plaintiffs. (Defs.' Reply Br. at 10, citing *Mich. Laborers' Pension Fund v. Rite Way Fence, Inc.*, No. 13-cv-13727, 2015

---

[5] Notably, at the motion hearing, Plaintiffs' counsel assured the Court that Plaintiffs are not seeking to collect contributions here that were previously paid by the parties to the NLRB action. As will be discussed further *infra*, while the Court is granting summary judgment to Plaintiffs and against LGC on the issue of liability for unpaid contributions, it is reserving its decision on the amount of the contributions owed until a later date. As such, the parties will have another opportunity to explore whether any contributions LGC paid pursuant to the NLRB settlement include contributions the audit reflects are still owed.

WL 1885542 (E.D. Mich. Apr. 24, 2015).)  Defendants assert: "Taking the

evidence in the light most favorable to Defendants, there is a genuine issue of fact

as to Plaintiffs' entitlement to the amounts claimed in their audit for the period of

October 2015-January 2016."  (*Id*.)  It is unclear what evidence Defendants believe

they have offered to create an issue of fact as to the amounts due, however.

Defendants do not point to any errors in the auditors' calculations.  The only

challenges they raise to the audit are the liquidated damages sought and that it

includes work performed by Darrel Cizek, Jr. who Mr. Shastri states was a

supervisor only and never worked as a stationary engineer or boiler operator.

(Defs.' Reply Br. at 7, ECF No. 41 at Pg ID 391.)  Defendants' own records,

however, use the same code to identify Mr. Cizek as the boiler operator and plan

engineer. (Pls.' Reply Ex. 4, ECF No. 42-5 at Pg ID at 626.)

With respect to Plaintiffs' entitlement to liquidated damages, as set forth

above and as Defendants in fact acknowledge (*see* Defs.' Resp. Br. at 15, ECF No.

41 at Pg ID 399), ERISA authorizes a court to award liquidated damages to a plan

as "*provided for under the plan*[.]"[6]  29 U.S.C. § 1132(g)(2)(C), emphasis added.

The CBA expressly incorporates the funds' Plan and Trust documents.  Those

documents empower the trustees "to impose a reasonable cost of collection

---

[6] Under the statute, liquidated damages cannot exceed 20% of the amount due.  *See*
29 U.S.C. § 1132(g).  Plaintiffs seek liquidated damages at a rate of 10% of the
amounts due.  (*See* Pls.' Mot. Ex B, ECF No. 36-3.)

assessment upon a delinquent Employer, in the nature of liquidated damages …." (Pls.' Mot. Ex. G at 9, ECF No. 36-8 at Pg ID 362.)

The Plan and Trust documents attached to Plaintiffs' supplemental submission further reflect that they are entitled to liquidated damages equal to at least ten percent (10%) of the unpaid contributions. Because those documents are expressly incorporated into the CBA, the employer agreement does in fact include a liquidated damages provision. Therefore, the Court concludes that Plaintiffs are entitled to liquidated damages on the unpaid contributions eventually found to be due and owing.

With respect to the amounts due and owing, Defendants maintain that they have not had the opportunity to properly review and test the audit. According to Defendants, they did not receive the audit results until Plaintiffs filed their summary judgment motion. Therefore, if the Court finds no genuine factual dispute that Defendants owe unpaid contributions for the October 2015-January 2016 period, they ask for additional time to conduct discovery under Federal Rule of Civil Procedure 56(d). (Defs.' Resp. Br. at 10, ECF No. 41 at Pg ID 394.)

Defendants offer an affidavit pursuant to Rule 56(d) from their attorney, Don Blevins, who states that because Plaintiffs' complaint did not specify the time periods for which they were claiming unpaid benefits, he was surprised to find amounts for a period preceding the NLRB settlement included in the audit results.

(*Id*. Ex. 8 ¶ 5, ECF No. 41-8 at Pg ID 526-27.)  Mr. Blevins further states that defense counsel has "engaged in an extensive effort to find payroll records from October 2015-January 2016" to "determine the accuracy of Plaintiffs' audit for that time period."  (*Id*. ¶ 6, Pg ID 527.)  According to Mr. Blevins, "Defendants require additional discovery of the documentation supporting Plaintiffs' audit in order to fully address the audit's findings . …"  (*Id*. ¶ 7, Pg ID 527.)  In its supplemental filing, Defendants identify the specific additional discovery they seek.  (Defs.' Supp. at 7-8, ECF No. 48 at Pg ID 817-18.)

At the motion hearing, Plaintiffs' counsel indicated that Plaintiffs do not "strongly oppose" Defendants' request for additional discovery.  The Court in fact believes that additional discovery is needed, particularly to determine precisely what amounts LGC paid pursuant to the NLRB settlement and to which funds, so as to avoid the double dipping Plaintiffs indicate they also want to avoid. Moreover, Defendants' contention that they lacked notice before receiving the audit results that contributions would be sought in this action for a period prior to the NLRB settlement is not unreasonable.  Notably, Plaintiffs' pleadings (including the Amended Complaint filed after the pending summary judgment motion was filed) do not identify the period(s) for when Plaintiffs were claiming contributions were due pursuant to the CBA.  (*See* ECF Nos. 1, 43.)  Defendants also should have the opportunity to fully review the numbers in the audit results.

Defendants also claim that LGC is not liable for unpaid contributions for the period from April-June 2018 because the CBA had already expired. Although recognizing that the CBA automatically renewed annually after August 12, 2017 absent termination notice by either party, Defendants argue that such notice was provided through Mr. Ringo. Defendants' evidence, however, does not show that Mr. Ringo timely exercised LGC's right to terminate the CBA.

According to its express terms, written notice of a party's intent to terminate the CBA had to be sent to the other party via registered or certified mail "at least sixty (60) days prior to any anniversary date of th[e] Agreement." As relevant to the current dispute, that deadline was June 13, 2017. The email Defendants present to show that the CBA was terminated in 2017, is dated July 3, 2017, and is between Mr. Ringo and Mr. Shastri. (Defs.' Resp. Br. Ex. 6, ECF No. 41-6.) Plaintiffs introduce the actual letter Mr. Ringo sent to the union's representative, which is dated almost two weeks *after* the June 13 deadline. (Pls.' Reply Ex. 1, ECF No. 42-2.) Moreover, as Plaintiffs point out, there is no evidence that the letter was sent via registered or certified mail.

At the motion hearing, Defendants additionally argued that Plaintiffs should be estopped from seeking contributions after August 12, 2017 because: (1) the Union never responded to Mr. Ringo's letter to point out that it was ineffective to terminate the CBA; (2) the Union subsequently persuaded LGC to enter into a new

CBA; and (3) LGC thereafter treated its Union employees as regular employees by *inter alia* providing them fringe benefits directly. The conduct on which Defendants rely, however, is attributable to only the Union and not Plaintiffs. As discussed earlier, Sixth Circuit precedent establishes that, with limited exception not applicable here, an employer cannot raise a defense arising from the union's conduct against the ERISA funds. *See supra.*

Defendants therefore do not create a genuine issue of material fact with respect to LGC's liability for unpaid contributions for the April-June 2018 period, either.

### Mr. Rachmale's Liability for Unpaid Contributions

Plaintiffs assert that Mr. Rachmale is jointly and severally liable for LGC's unpaid contributions for the periods at issue as an ERISA fiduciary.

Under ERISA, "[a]ny person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries …shall be personally liable to make good to such plan any losses to the plan resulting from each such breach." 29 U.S.C. § 1109(a). ERISA defines a fiduciary, in relevant part, as any person who "exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets, … [or]

has any discretionary authority or discretionary responsibility in the administration of such plan." 29 U.S.C. § 1002(21)(A)(i), (iii).

The Sixth Circuit "employs a functional test to determine fiduciary status." *Briscoe v. Fine*, 444 F.3d 478, 486 (6th Cir. 2006) (citing *Hamilton v. Carell*, 243 F.3d 992, 998 (6th Cir. 2001)) (observing that "[t]he Supreme Court has recognized that ERISA 'defines 'fiduciary' not in terms of formal trusteeship, but in functional terms of control and authority over the plan …'"). A party's status as a fiduciary "'is not an all or nothing concept'"; a court must ask whether the person is a fiduciary "'with respect to the particular activity in question.'" *Id*. (quoting *Moench v. Robertson*, 62 F.3d 553, 561 (3d Cir. 1995)). The question of whether an individual is a fiduciary under ERISA is a mixed question of law and fact. *Id*. (citing *Hamilton v. Carell*, 243 F.3d 992, 997 (6th Cir. 2001)).

With respect to a person's "authority or control respecting management or disposition of [plan] assets," ERISA does not define when funds become "plan assets" and the Sixth Circuit has yet to consider when unpaid benefit contributions become plan assets. *See Trustees of the Operating Eng'rs Local 324 v. Glencorp, Inc.*, 178 F. Supp. 3d 600, 607 (E.D. Mich. 2016). Some Circuit Courts and judges in this District, however, have held that pension and welfare benefit fund contributions become plan assets as soon as they are "due and owing." *Id*. at 607-

08 (citing cases); *see also In re Bucci*, 493 F.3d 635, 642 (6th Cir. 2007) (assuming without deciding that unpaid employer contributions are ERISA plan assets).[7]

Plaintiffs rely on two facts to establish that Mr. Rachmale is personally liable for the unpaid contributions as an ERISA fiduciary: (1) he signs checks on behalf of LGC and (2) he borrowed assets from LGC for personal use as evidenced by a 2017 loan. Plaintiffs rely on Defendants' Answers to Interrogatories 4 and 6 as the supporting evidence for these factual assertions. (*See* Pls.' Mot. Ex. E at 4-5, ECF No. 36-6 at Pg ID 346-47.) Plaintiffs argue that "[t]his evidence shows that [Mr. Rachmale] had control over the assets of LGC Global, assets that belong to the Fund." (Pls.' Br. in Supp. of Mot. at 13, ECF No. 36 at Pg ID 289.)

Defendants argue in response that this evidence is insufficient to show that Mr. Rachmale was responsible for making contributions to the funds or exercised control over the disposition of plan assets. Alternatively, Defendants contend that there is a genuine issue of material fact with regard to whether Mr. Rachmale was clearly aware of his status as a fiduciary. Because the Court concludes that

---

[7] The Eleventh Circuit has held that unpaid employer contributions are not "plan assets" unless specific and clear language in the plan documents or other evidence so indicates. *ITPE Pension Fund v. Hall*, 334 F.3d 1011, 1013-14 (11th Cir. 2003). The health care plan documents here provide that "[c]ontributions become vested Plan assets at the time they become due and owing to the Fund." (Pls.' Mot. Ex. G at 2, ECF No. 36-8 at Pg ID 355.)

Plaintiffs present insufficient evidence to show that Mr. Rachmale acted as an ERISA fiduciary, it declines to address Defendants' alternative argument.

The Sixth Circuit's decision in *Briscoe* reflects that an individual with power to write checks *on a plan account* is an ERISA fiduciary regardless of whether the individual exercised *discretionary* authority or control. 444 F.3d at 493-94. In *Briscoe*, the Sixth Circuit found that the third-party administrator of a company's healthcare plan qualified as an ERISA fiduciary because it collected COBRA payments from former employees, paid out claims approved by the company from plan assets, and disposed of the remaining funds in the plan bank account (including keeping some of the money as an administrative fee) when it cancelled its administrative contract with the company. *Id.* at 490-91. The Sixth Circuit relied on cases from the Second, Ninth, and Tenth Circuits to support its holding. *Id.* at 492-94 (citing *IT Corp. v. Gen. Am. Life Ins. Co.*, 107 F.3d 1415 (9th Cir. 1997); *LoPresti v. Terwilliger*, 126 F.3d 34 (2d Cir. 1997); *David P. Coldesina, D.D.S. v. Estate of Simper*, 407 F.3d 1126 (10th Cir. 2005). Neither *Briscoe* nor the cases on which it relies for its holding support the conclusion that an individual is an ERISA fiduciary simply because he or she has the authority to write checks on the employer's general account.

The Second Circuit's decision in *LoPresti* most clearly demonstrates this. In that case, two brothers were the sole shareholders and officers of a company that

was obligated under a collective bargaining agreement to deduct contributions from its employees' paychecks to fund benefit and pension plans. *LoPresti*, 126 F.3d at 37. Those deductions were deposited into the company's general account. *Id*. When the company began to experience financial difficulties, the money in the account was used to pay off other creditors, leaving the plans with insufficient funds. *Id*. The brothers were the only signatories on the account, but the Second Circuit concluded that only one of them was an ERISA fiduciary. *Id*. at 40-41.

That brother, Donald, signed checks on the account, including checks payable to the funds, and "[o]f equal if not more import … had a role in determining which bills to pay, in that he decided which creditors were to be paid out of the [c]ompany's general account (which, during the relevant time frame, included employee Fund contributions), and when those creditors were paid." *Id*. at 40 (brackets added). The court held that Donald was an ERISA fiduciary, reasoning that his "commingling of plan assets with the Company's general assets, and his use of those plan assets to pay Company creditors, rather than forwarding the assets to the Funds means that he exercise[d] … authority or control respecting … disposition of [plan] assets[.]'" *Id*. (quoting 29 U.S.C. § 1002(21)(A)(i)). The Second Circuit cited three decisions in support of this conclusion: *Yeseta v. Baima*, 837 F.2d 380 (9th Cir. 1988) (an employee in charge of plan administration and who, at the direction of company principals, withdrew plan assets, and placed those

25

assets in the company's account to pay "necessary operating expenses" held personally liable as a fiduciary under ERISA); *Connors v. Paybra Mining Co.*, 807 F. Supp. 1242, 1246 (S.D.W. Va. 1992), *appeal dismissed*, 21 F.3d 421 (4th Cir. 1993) (company officers and directors exercised authority or control respecting management or disposition of plan assets, and thus were ERISA fiduciaries, where they made "personal, conscious choices" to use withheld employee contributions to cover company expenses); *Reich v. Cook*, 94cv2069, slip op. at 10-11 (D. Conn. Mar. 24, 1997) (defendants fell within the ambit of section 1002(21)(A) where, even though other employees processed checks for their signature, they were the only signatories on the corporate account, and they "retained the authority to instruct those employees as to what checks to process and what monies were to be paid out[]").

Conversely, the Second Circuit in *LoPresti* found that the other brother, John, "did not exercise authority or control regarding the disposition of plan assets," and thus was not personally liable as a fiduciary under ERISA. 126 F.3d. at 40-41. The court reasoned:

> Even though he was authorized to sign checks on the Company's account and he had some general knowledge that deductions were made from employees' wages . . . he was "primarily" a "production" person with "no responsibility for determining which of the company's creditors would be paid or in what order."

*Id*. (brackets omitted).  More recently, citing the same lack of involvement in decisions about the priority of creditors and bills to pay, the Second Circuit concluded that an officer of a corporation with check writing authority did not engage in or have the authority to engage in activities that would make him a fiduciary under ERISA.  *Finkel v. Romanowicz*, 577 F.3d 79, 86-87 (2009).

The Tenth Circuit also relied on the distinction between individuals who are signatories in name only and those with authority to direct when and how payments are made when assessing ERISA fiduciary status in *David P. Coldesina, D.D.S.* 407 F.3d at 1133-34.  The court explained,

> *any authority or control* over plan assets is sufficient to render fiduciary status.  As such, acting as a signatory on behalf of a plan can indicate fiduciary control.  *See IT Corp.*, 107 F.3d at 1421-22 ("The right to write checks on plan funds is 'authority or control respecting management or disposition of assets.'") … However, performing this function in name only is likely insufficient.  *See LoPresti*, 126 F.3d at 40 ….

*David P. Coldesina, D.D.S.*, 407 F.3d at 1133 (emphasis in original, additional citation omitted).  The court concluded that an accountant who received contribution funds from the plan, which he deposited into his business account, and then wrote checks on behalf of the plan for the amount of the contributions was an ERISA fiduciary because he "had total control over the plan's money while it was in *his* account." *Id*. (emphasis added).  He had "'the authority to direct payment of [the] plan's money . . ..'" *Id*. at 1134 (quoting *IT Corp.*, 107 F.3d at 1421).

27

Plaintiffs have not presented evidence to show that Mr. Rachmale had any role in deciding or directing who to pay from LGC's business account or when to make payments from that account. Plaintiffs only show that Mr. Rachmale signed some checks on behalf of LGC, including a single check to one of the plaintiff funds. (*See* Pls.' Reply Ex. 7, ECF No. 42-8 at Pg ID 673.) While the evidence reflects that Mr. Rachmale borrowed money from the company, Plaintiffs have not shown that he was involved in deciding that the loan should be made. As such, Plaintiffs fail to show that he was anything more than a signatory in name only. *See David P. Coldesina, D.D.S.*, 407 F.3d at 1133.

Therefore, the Court is denying summary judgment to Plaintiffs with respect to Mr. Rachmale's personal liability for the unpaid contributions.

## Plaintiffs' Request for an Audit

In their motion for partial summary judgment, Plaintiffs also ask the Court to order Defendants to make LGC's books and records available for an audit to determine whether additional contributions are due for periods not covered in the previous audit—in other words, for the period beginning January 2016. Plaintiffs rely on the terms of the CBA and ERISA as support for this request. The trust documents (which are expressly incorporated into the CBA) require LGC to provide all of its records upon the trustees' request to enable the trustees to conduct audits to determine the amount of contributions due. (*See, e.g.*, Pls.' Mot. Ex. G

Art. VII § 9, ECF No. 36-8 at Pg ID 362); *see also Central States v. Central Transport*, 472 U.S. 559 (1985) (finding similar language in trust documents consistent with ERISA' policies).

In their response brief, Defendants do not dispute Plaintiffs' entitlement to an audit. Defendants do contend, however, that they already fully complied with Plaintiffs' requests for LGC's records and that Plaintiffs already conducted their audits (or had a full opportunity to do so). Defendants argue that Plaintiffs are "seek[ing] to expand discovery in perpetuity" by requesting additional audits and are attempting "to audit periods of time long after LGC's employees have stopped doing the work on the Project, at least not without some justification." (Defs.' Resp. Br. at 24-25, ECF No. 41 at Pg ID 409.)

It is not clear why Plaintiffs did not previously conduct the audit they now seek to perform. It also is not clear what specific time period(s) Plaintiffs seek to explore in an additional audit. However, to the extent Plaintiffs have a reasonable basis for believing that covered work was done in any period for which contributions may be owing and for which an audit was not previously completed, they are entitled to their requested relief because the plain language of the CBA empowers the funds to request an employer's records and to conduct an audit.

## Conclusion

For the reasons stated above, the Court concludes that Plaintiffs are entitled to summary judgment with respect to LGC's liability for fringe benefit contributions owed for the periods October 2015-January 2016 and April 2018-June 2018. Plaintiffs have not met their burden to show that Mr. Rachmale is liable as an ERISA fiduciary for any unpaid contributions.

Because the Court believes that Defendants should be allowed additional discovery in connection with the audit results and the amount of contributions due for those periods, only, it declines to award Plaintiffs the amount sought pursuant to 29 U.S.C. § 1132(g)(2). Plaintiffs, however, are entitled to liquidated damages on whatever amounts are eventually found to be due and owing.

Accordingly,

**IT IS ORDERED** that Plaintiffs' motion for partial summary judgment (ECF No. 36) is **GRANTED IN PART AND DENIED IN PART**.

**IT IS FURTHER ORDERED** that Plaintiffs' motion to strike Defendants' supplemental brief (ECF No. 49) is **DENIED**.

**IT IS FURTHER ORDERED** that discovery is extended for an additional thirty (30) days, but only with respect to the issues set forth herein.

s/ Linda V. Parker
LINDA V. PARKER
U.S. DISTRICT JUDGE

Dated: September 27, 2019

30